Estate of J. P. Morgan, Deceased, Junius S. Morgan, Henry S. Morgan and J. P. Morgan & Co., Incorporated, Executors v. Commissioner.
Estate of Morgan v. Commissioner
Docket No. 1770.
United States Tax Court
1944 Tax Ct. Memo LEXIS 65; 3 T.C.M. (CCH) 1156; T.C.M. (RIA) 44352; 47-1 U.S. Tax Cas. (CCH) P9155; October 30, 1944
*65 Montgomery B. Angell, Esq., and George Craven, Esq., 15 Broad St., New York, N.Y., for the petitioners. Conway Kitchen, Esq., for the respondent. SMITH Memorandum Opinion SMITH, Judge: This proceeding is for the redetermination of a deficiency in income tax of J. P. Morgan, deceased, for 1937 in the amount of $241,654.32. The proceeding presents the following issues: (1) Did the entire net income amounting to $120,276.08, which was derived during the calendar year 1937 from a trust created by the decedent on February 7, 1930, constitute taxable income to him for that year? (2) Was the decedent entitled to offset his individual capital net gains in 1937 by his distributive share of the capital net losses sustained in that year by J. P. Morgan & Co.-Drexel & Co., a partnership of which he was a member? (3) Was the decedent entitled to deductions from his taxable income for 1937 amounting to $25,000, $15,000 and $1,234.85 on account of payments alleged to have been made by him in that year to Annette B. Markoe, Carolyn K. Wright and James F. McLeod, respectively, as beneficiaries under the will of the decedent's father? (4) Did the decedent realize a taxable gain in 1937 to the *66 extent of the excess of the principal amount at which a mortgage participation certificate was cancelled and applied by the mortgagee as a reduction of the decedent's mortgage indebtedness in 1937 over the amount at which such certificate had been acquired by the decedent in 1936. (5) Was the decedent entitled to a deduction in 1937 amounting to $394,121.79 on account of the worthlessness of the capital stock of the American Gas Turbine Corporation? The petitioners are the executors of the estate of J. P. Morgan, who died testate on March 13, 1943. The decedent was a resident of the City of New York and filed an income tax return for 1937 with the collector for the Second District of New York. The return was made on the cash receipts and disbursements basis. It showed no net income for 1937 but a net loss of $35,594.79. By numerous adjustments to the return, some of which are not in issue in this proceeding, the respondent determined that the decedent had a net income adjusted for 1937 of $413,297.26. The issues will be separately considered in order. Issue I Findings of Fact. - The decedent by deed of trust dated February 7, 1930, created a trust, of which Junius S. Morgan *67 and Henry S. Morgan were trustees, and transferred to the trustees certain property. Article First of the deed of trust directed the trustees to pay over from time to time the net income thereof as specified in Schedule B annexed to the deed of trust and provided that: "* * * If at any time the current income from the trust shall not be sufficient to meet the charges against income as described in SCHEDULE B or any amendment thereto, full power and authority is hereby granted to the Trustees to apply any part of the principal to the payment of such income charges." Articles Second and Fourth of the Deed of Trust are as follows: "SECOND: Upon the death of any life tenant the trust created hereunder shall pro tanto cease and determine and the Trustees shall assign, transfer and pay over such principal of the said trust to the Grantor if living, otherwise to those persons who are named as residuary legatees in the Last Will and Testament of the Grantor. * * * * *
"FOURTH: The right to alter or amend the terms and conditions of this Indenture are hereby reserved to the Grantor, including the right to the Grantor to withdraw at any time any particular security forming part of *68 the capital assets and to substitute any other security or cash in lieu of such security withdrawn, but no right is reserved to revoke, repeal or in any wise revest any of the income of the trust herein created to the said Grantor." Schedule B annexed to the trust indenture sets forth the income beneficiaries named on the creation of the trust, and specifies the amount payable annually to each. From time to time thereafter certain of the named beneficiaries died, and certain new beneficiaries were designated by the decedent to receive income of the trust. In 1931 and 1932 the decedent added securities to the trust, and in 1936 he purchased certain stocks and bonds from the trust for cash at their market values and sold certain shares of stock to the trust at their fair market values. The net income of the trust for 1937, before deducting amounts distributed or distributable to beneficiaries amounted to $120,276.08, which consisted of ordinary income of $114,846.61 and capital net income of $5,429.47. Of such net income the trustees distributed $42,626.33 of ordinary income to beneficiaries named in the trust instrument and retained the balance of $72,220.28 of ordinary net income *69 and $5,429.47 of capital gain. None of the persons who received the $42,626.33 was a member of the decedent's immediate family or a creditor of the decedent; they were all either friends or former employees of the decedent. In his income tax return the decedent did not include in gross income any part of the $120,276.08 representing the total net income of the trust. The respondent has included this amount in the determination of the deficiency. Opinion. - The petitioners concede that the ordinary net income of $72,220.28 is taxable to the decedent as grantor. They contend, however, that the balance of the net income consisting of $42,626.33 ordinary net income and $5,429.47 capital net gain is not taxable to him. It will be noted that by the terms of the deed of trust the grantor reserved the right "to alter or amend the terms and conditions of this Indenture." This is sufficient to make the grantor taxable upon the entire net income of the trust. The issue is decided for the respondent upon the authority of ; ; *70 . Issue II Findings of Fact. - The decedent was a member during the year 1937 of the partnership of J. P. Morgan & Co.-Drexel & Co. Such partnership sustained a capital net loss on the sale of securities in 1937 amounting to $1,825,885.40, of which the decedent's distributive share was $253,412.76. During 1937 the decedent realized a capital net gain from the sale of securities individually owned by him amounting to $203,577.34. The partnership in its income tax return for 1937 claimed and was allowed a deduction amounting to $2,000 on account of the capital net loss sustained through the sale of capital assets in that year. This $2,000 deduction was reflected in computing the net income of the partnership and the decedent's distributive share therein. Opinion. - The question presented by this issue is whether the decedent may offset the capital net gain realized by him individually by any part of the capital net loss of the partnership. Precisely the same question was before this Court in , wherein another partner *71 of the same firm made a like contention. We held that the net capital gain of the individual partner might be offset by his pro rata share of the capital net loss of the partnership. In accordance therewith this issue is decided in the petitioners' favor. Issue III Findings of Fact. - The decedent's father died on March 31, 1913, leaving a last will and testament dated January 4, 1913, which was admitted to probate April 22, 1913. The decedent was the residuary legatee and devisee under the will. In the will the decedent's father directed his executors to set aside in trust from his estate a sum sufficient to yield an annual net income of $25,000 and to pay over said $25,000 annually to Dr. James W. Markoe during his lifetime, and upon Dr. Markoe's death to pay the said $25,000 to Annette B. Markoe, the wife of the doctor, during her lifetime. The executors were authorized in lieu of setting apart such trust fund to accept the obligation or bond of the decedent to make the annual payment of $25,000. On January 1, 1916, the decedent entered into an agreement with the executors of his father's estate whereby he obligated himself to make the aforesaid $25,000 annual payment *72 in accordance with Article XVI of his father's will and the said executors accepted the decedent's obligation to make such payment in lieu of setting up a trust out of the estate of the decedent's father for that purpose. The decedent's father also directed his executors to pay to J. F. McLeod 250 pounds sterling per annum during his life. The executors were directed to set up a trust sufficient to yield an annual net income of 250 pounds sterling for that purpose. The executors were authorized in lieu of setting up the trust fund to accept the bond or obligation of the decedent to make the said annual payment of 250 pounds sterling. On January 1, 1916, the decedent entered into an agreement with said executors whereby he obligated himself to make the said annual payment of 250 pounds sterling to J. F. McLeod as provided for in Article XXIII of his father's will and the executors accepted the decedent's obligation in lieu of setting apart a trust fund for that purpose. Pursuant to the said agreements of January 1, 1916, the decedent paid to Annette B. Markoe during 1937 $25,000, and to J. F. McLeod $1,234.85, which was the equivalent of 250 pounds sterling. In his income tax return *73 for 1937 the defendant did not claim deductions from his taxable income on account of the above referred to payments of $25,000 and $1,234.85. Opinion. - Although the petition alleges that the respondent erred in not allowing the deductions from gross income of the above referred to amounts of $25,000 and $1,234.85, and also $15,000 paid to Carolyn K. Wright, no evidence is offered with respect to the alleged payment of $15,000 to the last-named person. In the determination of the deficiency the respondent did not allow the claimed $15,000 deduction. We assume that the petitioners have abandoned their claim to the deduction of $15,000 alleged to have been paid to Carolyn K. Wright. It is the respondent's position that the amounts in question were capital expenditures; that the agreement made by the decedent with the executors of his father's estate to make annual payments to Dr. Markoe, and, after his death to his widow, Annette B. Markoe, and to James F. McLeod, was in substance a purchase by the decedent of a part of the residuary estate of his father; that is to say, instead of having a part of the residuary estate carved out and placed in trust funds, the decedent received *74 the entire residuary estate by agreeing to make the annual payments. This position of the respondent is sustained upon the authority of ; ; . Issue IV Findings of Fact. - The decedent from the time of his father's death in 1913 until after 1937 was the owner of all the stock of Flintlock Realty Co. (hereinafter referred to as Flintlock), a New York corporation. Flintlock was used by the decedent as a nominee to hold title to his New York City real estate and the decedent uniformly included in his individual income tax returns all items of income and claimed as deductions all deductions of Flintlock. By an indenture dated May 29, 1926, Flintlock acquired the premises known as 26-30 East 37th Street, New York City, from the executors and trustees under the last will and testament of Charles Lanier, deceased. On June 1, 1926, Flintlock gave a bond to the executors and trustees under the last will and testament of Charles Lanier, *75 deceased, in the amount of $255,000 in part payment of the purchase price of 26-30 East 37th Street, New York City. On the same date it executed a mortgage on that property in favor of the executors and trustees in the amount of $255,000. The total purchase price of the property was $425,000, of which $255,000 was covered by the bond and mortgage and the balance of $170,000 was paid by the decedent in cash. On June 1, 1934, the decedent paid $25,000 on the principal of the bond and mortgage thereby reducing it to $230,000. Thereafter the principal of the bond and mortgage was represented by a number of mortgage participation certificates which had been distributed to those entitled to receive the same under the will of Charles Lanier, which were transferable by assignment. On October 2, 1936, the decedent purchased one of these certificates of a face value of $45,097.50 for $38,500 cash. In 1937 the decedent surrendered this certificate in reduction of the principal by the amount of $45,097.50. In his income tax return for 1937 the decedent did not report any taxable income from the transaction. The respondent has determined that he had taxable income in 1937 from the transaction *76 amounting to the difference between the face value of the mortgage participation certificate surrendered and cancelled in 1937, and the purchase price thereof, or $6,597.50. Opinion. - The respondent contends that the decedent realized taxable income in 1937 representing the difference between the cost ($38,500) to him in 1936 of the mortgage participation certificate and the face value thereof ($45,097.50) by which the mortgage deed was reduced by the surrender and cancellation of the mortgage participation certificate in 1937. In support of this contention the respondent cites , and . The petitioners argue that if the decedent derived any taxable income from the transaction that income was realized in 1936, the year in which the mortgage participation certificate was acquired by the decedent - admittedly the obligor on the mortgage. This position of the petitioners is sustained upon the authority of , and . *77 Issue V Findings of Fact. - In his income tax return for 1937 the decedent claimed the deduction from gross income of the amount of $394,121.79, representing his investment in shares of stock of American Gas Turbine Corporation, which were alleged to have become worthless in that year. This deduction was disallowed by the respondent upon the ground that the stock became worthless prior to the taxable year 1937. The American Gas Turbine Corporation was incorporated under the laws of the State of Delaware on May 24, 1922, with an authorized capital stock of 200,000 shares, no par value. An amended certificate of incorporation was filed on June 17, 1929, providing for an authorized capital stock of 600,000 shares at a par value of $1 per share. Between April 22, 1932, and June 16, 1937, the issued and outstanding capital stock of the corporation amounted to 384,971 shares. The decedent on various dates from April 4, 1923, to July 16, 1931, acquired 205,730 shares of the capital stock of American at a total cost or other basis of $394,121.79. The dates of acquisition, number of shares acquired on each date, method of acquisition, and cost of such shares, are as follows: Date
Shares
Method of Acquisition
Cost
April 4, 1923
5,000
purchased for cash
$ 20,000.00
July 25, 1923
7,500
purchased for cash
30,000.00
Dec. 4, 1930
31,215
received in liquidation of 23,000 shares of stock
of Gas Turbine Corporation, on dissolution of
that corporation, at fair market value of
$1.787 per share
55,781.21
Dec. 26, 1930
100,140
purchased for cash at $1.787 per share
178,950.45
Apr. 1, 1931
2,798
purchased for cash at $1,787 per share
5,000.03
May 4, 1931
5,138
purchased for cash at $1.55724 per share
8,001.11
July 1931
48,343
received in liquidation of 501 shares of stock of
Harpstone Corporation, on dissolution of that
corporation, at fair market value of $1.787
per share
86,388.94
July 16, 1931
5,596
purchased for cash at $1.787 per share
10,000.05
Totals
205,730
$394,121.79
*78 The 23,000 shares of stock of Gas Turbine and 501 shares of stock of Harpstone referred to in the above statement were purchased by the decedent from time to time from June 20, 1922, to December 1, 1926, inclusive, for sums amounting to $81,235 for the Gas Turbine stock and $143,010 for the Harpstone stock. After the above purchases had been made by the decedent American had the right, pursuant to the commitment of the decedent by his letter of December 19, 1930, to call on the decedent at any time before March 31, 1934, to purchase an additional 27,219 shares of its stock at $1.787 per share, a total of $48,640.53. The Harper engine was something entirely novel in the automotive field. The main working part or rotor was composed of five rotating cylinders which rotated on a fixed axis, the heads surrounding the central shaft to which the cylinders were attached. The reaction members were connected by simple yoke pieces and wrist-pins. The power was condensed into a small space, the combustion chambers being only a short distance from the center of rotation. The cylinders lay in one plane within the flywheel which rotated them, and connecting rods were eliminated. The operation *79 of the motor was much the same as that of an electric motor. The Harper rotary engine possessed many advantages over the standard reciprocating automotive engine. It was smaller and simpler of construction in proportion to its power. It had no crank shafts, flywheel, cam shaft, poppet valves, springs, or any of the attendant valve mechanism, no oil pump, and no reciprocating parts, all of which were contained in the conventional reciprocating engine. It was less than half as heavy for the same amount of power, and its manufacturing costs were less than half of those of a corresponding conventional type of engine. The absence of reciprocating parts and reversal stresses made it possible to operate the motor at any reasonable speed without noise or vibration and the compactness of the motor made it applicable to many uses to which the conventional type motor was not suited. It was believed that the Harper engine could be developed and made useful in many different fields. There was a possibility that it could be used in airplanes, automobiles, motor boats, and it was believed that it would prove to be particularly suitable for use by farmers where electricity was not available for *80 electric motors. In 1922 or early 1923 Paul F. Foster, then a young officer in the United States Navy and a graduate of Annapolis who had been making a study of internal combustion engines for a number of years, heard about the Harper rotary engine. He made an examination and investigation and became very much interested in it. After he was convinced of the potential value of the engine and had learned that Harper was seeking additional capital with which to carry forward his development work. Foster brought the matter to the attention of the decedent whom he had known for several years. The decedent also became interested. As a result of such interest the decedent invested very substantial sums in the stock of the corporation, making his last investment in such stock on July 16, 1931. American became the owner of 11 patents issued to Harper covering the application of various devices to the rotary engine of which 5 were issued in 1922 and 1925, 4 on June 30, 1929, 1 on September 23, 1930, and 1 on June 6, 1933, all of which were applied for some time prior to the dates of issuance. While the work on the engine was going on Harper made dynomometer tests of the engine from time *81 to time in the company's machine shop and laboratory at 1926 Broadway, New York City.This shop was opened in 1922 or 1923 and American continued to do experimental and development work in it until 1930, when the shop was closed. In the latter part of 1925 one of the engines was installed in a cabin cruiser and subjected to an endurance test in continuous operation and during October and November, 1925, 5 motors were completed at the company's shop. In December, 1925, in a test run of 100 miles on Long Island Sound, a Harper engine installed in a cruiser was run in comparison with a standard type engine of approximately equal power. The Harper engine drove the boat at approximately the same speed as the standard gas engine and consumed much less gasoline. Dynomometer tests of the engine were made in 1927 and 1929 at the Brooklyn Polytechnic Institute. These tests showed that the performance of the Harper engine was approximately equal to that of the standard internal combustion engine then being manufactured. About 1929 or 1930 a Harper rotary engine was installed in a 1928 Model Ford car owned by George C. Fuller, an officer and director of the company. This car was driven on long *82 trips through New England, Long Island, to the Adirondacks, and to Detroit, Mich., for a demonstration at the plant of the Chrysler Corporation. The engineers of the Chrysler Corporation were interested in observing the performance of the engine but came to the conclusion that it was not adapted for use in automobiles since it developed only 10 to 15 horsepower whereas an automobile engine had to be much more powerful. An exhibit of the Harper engine was maintained by American at the National Motor Boat Show held in New York City in the years 1926 to 1929. The Purdy Boat Works, of Port Washington, New York, because of its interest in the Harper engine, built a boat for use in connection with American's exhibit at the motor boat shows. On December 1, 1926, a contract was entered into between American and Osborn Development Co., Inc., whereby the latter was employed to supervise and manage American, including the keeping of necessary books and records to assist it in negotiations with respect to the sale, licensing, and exploitation of American's patents and inventions. Osborn Development Co. and Frederick Osborn, now Major General Osborn of the United States Army, had been engaged *83 for several years in managing patent developments and enterprises resting on patents. Osborn was a director of American from December 9, 1926, and president of American from October 29, 1930, to its dissolution. Efforts were made by Osborn Development Co., Inc. to interest many companies in the Harper engine and to license the patents owned by American. It conducted negotiations with officials of the Wills, St. Clair Co., the A. C. Spark Plug Co., Westinghouse Electric Co., and the Chrysler Corporation but no license, manufacture or sale under the patents of American ever resulted from those negotiations. The Johnson Motor Co. was leading manufacturer of small motors for use in boats and for industrial purposes. A licensing agreement was entered into between American and Johnson Motor Co. on March 14, 1930. This granted to the Johnson Motor Co. a license to manufacture, use and sell the device covered by the Harper patents on a royalty basis and in which the Johnson Co. agreed to proceed with the development work necessary to adapt the Harper engine to its requirements. This contract was cancelled by agreement of the parties on April 7, 1931, without any work having been performed *84 by the Johnson Motor Co. thereunder. Demonstrations of the engine were made in 1930 to engineers of the Wright Aeronautical Co. On November 20, 1930, a contract was entered into between American and that company by which it was agreed that Wright would construct or readapt at its plant at Paterson, N.J., one or more engines, the engines or designs to be furnished by American, which would provide free of charge the engineering advice, counsel and supervision and pay for materials, labor and rent of equipment. This contract was terminated by mutual agreement of the parties on May 1, 1931. On January 31, 1931, a written employment contract was entered into between American and Harper. Harper's compensation under that contract was fixed at $125 per week. At that time it was decided to concentrate the work of the company on a motor with small power, such as would be suitable for use as an outboard motor. Harper laid out a program of work to be done on the construction of such small motor, and, during 1931, and until the early part of 1932, he continued his work on the small motor at a machine shop in Brooklyn, N. Y. The decedent made loans to American of $1,000 on November 14, 1931, *85 $1,000 on December 31, 1931, and $750 on February 3, 1932, to defray the cost of this work and to meet current expenses of American. Prior to July 8, 1932, Harper devoted all his time to development work on the Harper engine as an employee of American. When it became difficult to obtain money from others to continue the work Harper continued work on the engine but under a different arrangement. On July 8, 1932, a written contract was entered into between American and Harper giving Harper an exclusive license to manufacture, use, and sell the devices covered by the Harper patents on a royalty basis. Under the agreement Harper was to have one year to develop the engine before the specified royalties were payable with the provision that if he should diligently prosecute the development work during the one-year period, but should not complete it, he should have an extension of six months to complete the work and with a provision for further extensions by agreement of the parties or by a decision of a board of arbitrators. The licensing agreement was terminated by agreement of the parties on February 4, 1935, effective as of June 1, 1934. Frank H. Miesse, a director and stockholder of *86 American, was a friend of William H. Nicholls, the head of William H. Nicholls Company, Inc., which was engaged in the business of manufacturing foundry molding machines at its plant at Richmond Hill, Long Island, N. Y. In the late summer or early fall of 1935, at a time when business was dull at the Nicholls Co. plant, Nicholls asked Miesse what was being done with the Harper engine and suggested that he would like to do some experimental work with it. At the request of Nicholls, Miesse arranged for some of the Harper engines and parts to be sent to the Nicholls plant. They were sent there in the latter part of December, 1935, and one of the engines was set up and put in running order in the early part of 1936. Nicholls died on August 5, 1936. His son, who became the head of the Nicholls Co., stated in the early part of 1937 that the Nicholls Co. would not carry on any further experimental work with the Harper engine, the plant being busy at the time on other matters. After American had been advised through Miesse that William H. Nicholls, Jr., had decided that he would not proceed with the work which his father had been doing on the Harper engine, the board of directors at a meeting *87 held on May 26, 1937, voted to dissolve American. At that time its only assets consisted of engines and parts of engines which had been constructed, and patents. These were sold at public auction on June 16, 1937, and bid in by George C. Fuller and Ernest L. Conant for $200. American was immediately dissolved and there was no liquidating dividend payable to the stockholders. American's balance sheet at December 31, 1932, showed as follows: ASSETS
Cash on deposit
$ 36.50
Machinery and equipment
228.72
Patents
125,872.01
Deferred Charges: Development expendi-
tures
$345,878.20
Patent expenses
27,890.33
Organization expenses
5,100.96
378,869.49
Total
$505,006.72
LIABILITIES
Accounts payable
$ 55.44
Accrued Delaware Franchise
Tax -
1932
50.00
Notes payable on demand
$2,750.00
Accrued interest payable
163.55
2,913.55
Capital stock
369,273.55
Capital surplus
132,714.18
Total
$505,006.72
After December 31, 1932, no entries were made on the books of account of American. All receipts and disbursements were recorded on the books of account of Davis, Polk, Wardwell, Gardner & Reed, American's attorneys. The total receipts and disbursements *88 of American from January 1, 1933, to July 14, 1937, amounted to $757.31. Of this amount $500 represents a check received from decedent on May 1, 1933, and $100 on January 26, 1935. The only other receipt of any consequence was a check from the auctioneers who sold the assets of the company on June 16, 1937, the proceeds amounting to $141. The disbursements consisted principally of storage fees on the corporation's machinery and equipment. In American's Federal income tax returns for the calendar years 1923 to 1925, inclusive, and from 1927 to 1936, inclusive, it was stated that the company "has not begun business" or is "transacting no business." In its return for 1928 it was stated that "The company is transacting no business, being engaged in the development of an internal combustion engine" and that "All expenditures are charged to development." In its returns for the years 1934, 1935, and 1936 it was stated that the corporation "is entirely inactive and is engaged in no business." In its return for 1937 it was stated that the corporation "Suspended business in 1932." In American's capital stock tax return for 1934 it was stated by Frederick Osborn, the company's president; "The *89 project has been abandoned because it has not proved to be profitable and there is no present prospect that it will ever be profitable." Also, "The corporation has not sold its assets because they are not salable, being a small amount of machinery in storage and the aforementioned unprofitable patents." Similar statements are attached to the capital stock tax returns filed for 1935 and 1936 and in the capital stock tax return filed for 1937 its treasurer stated that "In 1932 it gave the inventor an exclusive license to develop under the patents and ceased all activities. Such license has now expired but the Corporation has not renewed any activities. The project was abandoned because it did not prove to be profitable." The shares of stock of American were worthless in 1932 and in all subsequent years. Opinion The question under this issue is whether the decedent is entitled to deduct from his gross income for 1937 his investment of $394,121.79 in the shares of stock of American as a loss of that year. The petitioners claim that the stock in question became worthless in 1937 and that its worthlessness was not determined by any identifiable event prior to the dissolution of American *90 in 1937. It is their contention that there always was a "hope and expectation" up to the time of the dissolution of the corporation that something would be realized through the development of the Harper engine, the granting of licenses to manufacture same, or from the sale or licensing of some of the patents. Much evidence has been introduced as to the possibility of a realization from some of the patents up to the very date of dissolution. Major General Osborn testified that in his opinion one of the patents involving a tapering value was a very ingenious invention which might possibly be adapted to some other machine than the Harper engine and which might prove to be of value even if the Harper engine itself proved to be commercially unprofitable. The statute permits the deduction from gross income of "Losses sustained during the taxable year." Section 23(e), Revenue Act of 1936. There is no question but that the decedent sustained a loss of his investment in the shares of stock of American. The respondent concedes that he did, although he does not concede that the amount of the loss is the amount which we have found as the cost or other basis of the shares of American to the decedent. *91 He does contend, however, that that loss was not sustained in 1937. He says that the loss was sustained in a taxable year prior to 1937, although he does not attempt to set the year of the worthlessness of the stock. Article 23(e)-1 of Regulations 94, promulgated under the provisions of the Revenue Act of 1936, provides: In general losses for which an amount may be deducted from gross income must be evidenced by closed and completed transactions, fixed by identifiable events, bona fide and actually sustained during the taxable period for which allowed. Substance and not mere form will govern in determining deductible losses. * * * This regulation is based upon the holding in , in which the Supreme Court held that the income tax statutes "contemplate the deduction from gross income of losses, which are fixed by identifiable events." It should be noted, however, that that pronouncement of the Supreme Court was never intended to require the dissolution of a corporation as a prerequisite to the claim for a deduction of a loss on account of stock becoming worthless. Where it appears from all of the facts *92 that shares of stock became worthless in a given year, a taxpayer is entitled to deduct a loss based on that worthlessness, even though the corporation has not been dissolved and liquidated. Thus, in , the Supreme Court said: "Generally speaking the income tax law is concerned only with realized losses, as with realized gains. * * * Exception is made, however, in the case of losses which are so reasonably certain in fact and ascertainable in amount as to justify their deduction, in certain circumstances, before they are absolutely realized. * * * The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal, test." Ordinarily, a taxpayer who claims that shares of stock became worthless in a given year must show that the stock had some value prior to the taxable year. . The respondent contends that the decedent did not deduct the loss in any year prior to 1937 for the reason that for a number of years prior thereto the decedent had no taxable net income, or only *93 a negligible amount of income, and that he would have obtained no tax advantage by doing so. Respondent points out that decedent was the principal stockholder of American and could have brought about its dissolution at any time he saw fit. However that may be, we think the evidence shows that the stock became worthless prior to 1937. We do not agree with the petitioners that the dissolution of the corporation in 1937 was the first and only identifiable event which showed the stock to be worthless. We think that the evidence shows that the stock was worthless in 1932 and that it had no value whatever from a market standpoint in any subsequent year. The corporation had gone out of business; it maintained no office; had no employees; and had no income or receipts of any moment after 1932. Great efforts had been made to develop the Harper engine to a point where it would have a commercial value. All reasonable efforts had been made by the Osborn Development Co. to realize something for American through the licensing or sale of patents up to 1932 when it abandoned work for the company. Major General Osborn testified that he "never thought the [Harper] engine was a sound engine" and that *94 "Faith in the Harper engine I couldn't have." On April 20, 1931, in a letter to the decedent, he referred to a recommendation made in June, 1930, that one more try be made and recommended the expenditure of the sum of $2,100 in an effort to develop a little 6 horsepower motor. The decedent advanced this money. Even that effort did not prove to be successful and, on January 15, 1930, Major General Osborn advised the decedent by letter that he was at his "wit's end to know what to do about Harper motor." There is not a scintilla of evidence in this record to show that the shares of stock of American, owned by the decedent, had any value whatever after 1932. No shares of stock had been sold since 1931 and all or practically all of the shares sold during 1930 and 1931 had been purchased by the decedent pursuant to his commitment made to the company on September 1, 1930. It seems to us entirely unrealistic for petitioners to contend that the decedent's investment in the stock became worthless in 1937. In , the taxpayer was contending for the deduction of a loss arising from an investment in stock *95 which he contended became worthless during the taxable year. The court said: * * * True, it was not possible to say beyond imaginable peradventure that these assets might not be snatched at by some impressionable buyer, who did not share their owners' estimate of their value. But any such expectation was plainly illusory, and taxes, like other human affairs, must be determined without the gift of divination. So far as human foresight could go, the shares were worthless [prior to the taxable year] * * * The determination of the respondent that the decedent's investment in shares of American was not sustained in 1937 is approved. Decision will be entered under Rule 50.